UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO  DIVISION

| | | |
|---|---|---|
| RAYMOND H. RYAN, *et al.* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | Civil Action No: SA-07-CA-723-XR |
| | § | SA-07-CA-744-XR |
| RICHARD P. WHITEHURST, *et al.* | § | SA-07-CA-762-XR |
| | § | SA-07-CA-824-XR |
| Defendants. | § | SA-07-CA-855-XR |
| | § | |
| | § | |
| | § | |
| | § | |

## ORDER

Defendant Kelmar & Associates (Kelmar) filed a FED. R. CIV. P. 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted (Docket No. 65). The motion was filed on April 11, 2008. To date, Plaintiff has not responded.[1]

After considering the motion and pertinent case law, the Court GRANTS Kelmar's motion.

### Factual Background

Plaintiff Raymond Ryan worked for the Department of the Air Force in San Antonio, Texas

---

[1] By Plaintiff, the Court refers to Raymond H. Ryan. Although Ana A. Ryan is named as a Plaintiff in the Amended Complaint filed November 14, 2007, Raymond H. Ryan may not represent her as he is not a licensed attorney. Ana Ryan has not signed the petition, and it is not clear that she seeks to actually pursue any claims.

It is noted, however, that she did sign a proposed Scheduling Order (Docket No. 62). To the extent she currently asserts any claims, the Amended Complaint is wholly void as to any allegations or requests for relief. Therefore, Ana Ryan's claims, if any, are dismissed without prejudice for failure to state a claim and for lack of specificity. *See* FED. R. CIV. P. 12(b)(6) and Bell Atlantic Corporation v. Twombly, 127 S.Ct. 1955, 1965 (2007).

from 1988 until his termination from employment in March 2006. Ryan had been an aerospace engineer with the T56 aircraft engine program at Kelly Air Force Base (AFB) in San Antonio when that base was selected for closure in 1995. After Kelly AFB closed, the T56 engine work was transferred to contractors operating out of Tinker AFB in Oklahoma. Rather than be reassigned to Tinker AFB at this time, Ryan chose to remain employed as the Government's on-sight engineer for the T56 workload in San Antonio, although his supervisors were all located at Tinker.

In 2000-01, Ryan reported to his superiors defective equipment made by a contractor. Ryan also reported to the Air Force Office of Special Investigations alleged customs violations by a contractor. This contractor filed a complaint in July 2001 concerning Ryan's handling of the matter.

As time progressed, the relationship between Ryan and his superiors deteriorated. The Air Force apparently began receiving increased complaints about Ryan's demeanor and treatment of others in the workplace. In 2003, Ryan received a reprimand, followed by a performance rating which he considered unjustifiably low.

After receiving another complaint against Ryan in 2005, his supervisors decided that he could no longer continue working in San Antonio without supervision, and they ordered him to report for work at Tinker AFB in Oklahoma.

Around this time, however, Ryan informed his superiors that he was suffering from back problems, producing notes from two physical therapists. Eventually, he submitted a letter from a physician stating that his ability to travel was restricted by herniated disks and that it was inadvisable for him to sit in a vehicle for longer than thirty minutes at a time. Ryan also submitted documentation suggesting he suffered from further restrictions to his physical capacities, including limitations on his ability to lift, climb, twist, and pull.

2

During this same time period, however, coworkers allegedly witnessed Ryan lifting heavy boxes into his pickup truck. Concerned about the inconsistencies between what Ryan was telling them and what his coworkers were purportedly observing, Ryan's third-level supervisors, Colonel Henry Gaudreau and Deputy Director Thomas Laird, sought advice from the Employee Relations staff and the Judge Advocates General attorneys about how to proceed. As a result of these consultations, Gaudreau and Laird approved the hiring of Kelmar & Associates, a private investigation firm, to perform video surveillance of Ryan outside his home in St. Hedwig, Texas.

The surveillance was conducted by Kelmar employee Rusty Carr on December 26, 2005. According to Carr's affidavit, he "videotaped Mr. Ryan engaging in outdoor activities in front of his house, which included working on his tractor. His wife, Alicia [sic] Ryan, was also videotaped engaging in outdoor activities in front of their home which included taking out the garbage and placing it into a pickup truck parked in the front yard."[2] Carr attests that "these activities could be seen by passers-by driving on the public road running in front of Mr. Ryan's residence."[3]

Ryan was ultimately terminated from his position on March 21, 2006 for absenteeism and for failure to report to his new position at Tinker AFB. After a partially successful appeal to the Merit Systems Promotion Board, he was reinstated on October 14, 2007. As of the time this motion to dismiss was filed, Ryan had not yet reported for work at Tinker.

---

[2] Docket No. 65, Exhibit B at ¶ 4.

[3] *Id.*

3

**Analysis**

<u>Standard for Summary Judgment</u>

In determining the merits of a 12(b)(6) motion to dismiss, the Court "may not look beyond the pleadings" in ruling on the motion.[4] "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."[5] Here, Kelmar submitted an affidavit by its employee Rusty Carr, which was relied upon by the Court. The Court also relied upon a copy of the Kelmar videotape that was supplied to it by the Governmental Defendants.[6] Because the Court has gone beyond the pleadings, it is appropriate to treat this motion as one for summary judgment.

The Federal Rules provide that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[7] The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[8] Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present evidence setting forth

---

[4] McCartney v. First City Bank, 970 F.2d 45, 47 (5th Cir. 1992).

[5] FED. R. CIV. P. 12(d).

[6] *See* Docket No. 37, Exhibit 6.

[7] FED. R. CIV. P. 56(c).

[8] Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

4

"specific facts showing a genuine issue for trial."[9]

Fourth Amendment Right to Privacy

In his Amended Complaint, Plaintiff makes the following assertions against Kelmar:

The defendant, Kelmar & Associates, Inc., is not immune from personal liability from this suit because the covert surveillance was not committed in public view. The plaintiffs', Raymond Ryan and Ana Ryan, residence is located at approximately 1000 feet from public property. The defendant utilized a telescopic lens to observe and video tape the plaintiffs at this great distance. The defendant performed the covert surveillance operation at the behest of federal officials from Tinker AFB in Oklahoma City without a warrant. Kelmar & Associates, Inc. failed to verify whether the federal government officials employing them had the covert surveillance operation properly approved through judicial channels. Kelmar and Associates, Inc. utilized one of their private investigators to conduct covert surveillance of the plaintiffs at their residence without valid justification and in clear violation of federal laws. Kelmar & Associates, Inc. had not been directed to perform covert surveillance of plaintiff's spouse but did so without any provocation or authority. Kelmar & Associates, Inc. intentionally violated the privacy of the plaintiffs for the sole reason to obtain compensation without any regard as to the legality of the covert surveillance operation.[10]

Because Kelmar was acting as an agent of the United States Government in carrying out its surveillance, Plaintiff must show that the videotaping constituted an unreasonable search that violated his Fourth Amendment rights.

The Fourth Amendment to the United States Constitution reads:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

As the Supreme Court has stated, the "touchstone of Fourth Amendment analysis is whether

---

[9] FED. R. CIV. P. 56(e)(2).

[10] Docket No. 11 at 5-6.

a person has a 'constitutionally protected reasonable expectation of privacy.'"[11] A "Fourth Amendment search does *not* occur . . . unless the individual manifested a subjective expectation of privacy in the object of the challenged search, and society is willing to recognize that expectation as reasonable."[12]

The first step is to determine whether Plaintiff exhibited a subjective expectation of privacy in his front yard activities.[13]  Plaintiff's property abuts a public thoroughfare that cars travel along day and night. The videotaping by Kelmar took place during the day, and although Plaintiff asserts his house is set back from the road approximately 1,000 feet, the house is clearly visible from the street. Moreover, for most of the period that Plaintiff was videotaped, he was moving about in areas of his front yard that were visible from the public road. Nevertheless, Plaintiff did little or nothing to avoid being seen by those passing along the road. Plaintiff has failed to plead or submit any evidence which, under Fifth Circuit case law, would indicate he had a subjective expectation of privacy.[14]

---

[11] California v. Ciraolo, 476 U.S. 207, 211 (1986) (citing Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring).

[12] Kyllo v. United States, 533 U.S. 27, 33 (2001) (emphasis original).

[13] *See* United States v. Ishmael, 48 F.3d 850, 854 (5th Cir. 1995) ("Thus, unless we intend to render *Katz*' first prong meaningless, we must conclude that the Ishmaels exhibited a subjective expectation that their hydroponic laboratory would remain private.").

[14] *See, e.g.*, Kee v. City of Rowlett, Texas, 247 F.3d 206, 216 (5th Cir. 2001) ("We find that Kee and Routier have failed to . . . show that they had a subjective expectation of privacy. In their affidavits, Kee and Routier assert that their 'grieving conversations and statements' and 'oral prayers and communications to ourselves and our God' should be private and not subject to government wiretaps. These statements, alone, cannot sustain the weight of Kee and Routier's burden in establishing that they had a subjective expectation of privacy. . . For example . . . they do not argue that the prayers were hushed or that their voices were modulated to protect their conversations from 'uninvited ears,' and they have provided no information about the tone,

Even if Plaintiff did have a subjective expectation of privacy, such expectation was not reasonable under Supreme Court case law. In *California v. Ciraolo*, the Court found that the defendant did not have a reasonable expectation of privacy against a naked eye observation of his backyard by a police officer flying overhead at 1,000 feet.[15] Police in the *Ciraolo* case had received information that the defendant was growing marijuana in the backyard of his suburban home. The police had trouble verifying this allegation, however, because defendant's yard was encircled by a 6-foot outer fence and a 10-foot inner fence. Therefore, the police secured a private plane to fly over the house and see whether marijuana plants were growing in the yard. The Supreme Court found that this action did not violate a reasonable expectation of privacy, and thus, was not a search for Fourth Amendment purposes.

In reaching its conclusion, the Court in *Ciraolo* reasoned that the police observations took place in a public place, in a "physically nonintrusive manner," and were made with the naked eye.[16] While in this case Kelmar used a video camera with a zoom focus, such recording devices are by no means uncommon. The Supreme Court has stated that "surveillance of private property by using highly sophisticated surveillance equipment not generally available to the public, such as satellite technology, might be constitutionally proscribed absent a warrant."[17] Use of a video camera with a

_____

volume, or audibility of the private communications directed toward the graves. . . In similar fashion, Kee and Routier do not assert that their oral statements were communicated free from the possibility of eavesdroppers who might have been in close proximity to the grave site. . . Perhaps most damaging to Kee and Routier's argument is that they failed to present evidence demonstrating any affirmative steps taken to preserve their privacy.").

[15] 476 U.S. 207 (1986).

[16] *Id*. at 213.

[17] Dow Chemical Co. v. United States, 476 U.S. 227, 238 (1986).

non-exceptional zoom feature, however, hardly qualifies as "highly sophisticated surveillance equipment."[18]

More importantly, as was the situation in *Ciraolo*, the outdoor actions of Ryan and his wife were observable to members of the public passing along the roadway in front of Plaintiff's property.[19] Because the Ryans' actions were not hidden from the public view, they cannot successfully argue that they had a reasonable expectation that their publicly visible activities would not be recorded in a physically nonintrusive manner by someone parked in a car along the abutting public thoroughfare.

### Conclusion

Because the Ryans had neither a subjective nor reasonable expectation of privacy as those terms are understood for purposes of Fourth Amendment analysis, they have no privacy related claims against Defendant Kelmar that can survive summary judgment. Accordingly, Defendant Kelmar's motion to dismiss is granted. Having already dismissed all other Defendants from this case,[20] the Court instructs the Clerk to close the case.[21]

---

[18] Furthermore, "the mere fact that human vision is enhanced somewhat . . . does not [necessarily] give rise to constitutional problems." *Id*. The key inquiry is whether the enhanced vision reveals "intimate details" not otherwise observable. *Id*. There is no evidence that use of the zoom feature on the video camera operated by Kelmar crossed this line.

[19] In *Ciraolo*, the Court observed that "any member of the public flying in this airspace who glanced down could have seen everything that these officers observed." *Ciraolo*, 476 U.S. at 213-4.

[20] *See* Docket No. 72.

[21] The Clerk is also instructed to close the related cases of 07-CA-744, 07-CA-762, 07-CA-824, and 07-CA-855.

It is so ORDERED.

SIGNED this 2nd day of May, 2008.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE